Filed 12/13/13  In re Camilla F. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re CAMILLA F., a Person Coming Under the Juvenile Court Law. | C073695 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARIA F.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD232262) |

Maria F. (mother) appeals following an order terminating her parental rights as to

minor Camilla F.  (Welf. & Inst. Code,[1] § 366.26.)  She contends that the juvenile court's

---

[1]      Undesignated section references are to the Welfare and Institutions Code.

1

prior order terminating reunification services (§ 366.21) was erroneous, requiring the reversal of the subsequent order terminating parental rights.[2]  We shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2012, Sacramento County Department of Health and Human Services (the department) filed a section 300 petition as to the newborn minor, alleging that mother could not meet the minor's basic needs due to a developmental disability.

The detention report stated that the minor was placed in protective custody shortly after her birth due to "exigent safety concerns."  Mother could not follow instructions on caring for the minor or demonstrate appropriate caretaking skills despite repeated coaching by hospital staff.  Mother also could not take care of her own needs, requesting staff assistance every five to 10 minutes.

A mandated reporter had informed Child Protective Services (CPS) that mother was developmentally delayed.  But in speaking to the hospital social worker, mother refused to let the mandated reporter contact her family about a safety plan, would not accept voluntary services, and gave little information about the minor's father.  Though apparently fluent in both Spanish and English, mother presented like a 10- or 12-year-old child.

Mother told the department's social worker that she needed help to take care of the minor and would accept services.  Mother said her sister, Maria V., would help her; she

---

[2]      Mother challenged the section 366.21 order by writ petition in case No. C072698. We denied the petition summarily on January 31, 2013.  (*Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501.)

Although mother states that she also appeals from the denial of a subsequent petition for modification (§ 388) and the section 366.26 orders, and her notice of appeal encompasses the later orders, her opening brief raises claims of error only as to the section 366.21 order.  Therefore, we do not discuss the subsequent proceedings and orders.

also mentioned another sister, Petra, and a half sister, Dulce.[3]  However, mother could not answer most of the social worker's questions or articulate a safety plan.  During mother's interview with the social worker, mother repeatedly displayed her inability to take care of the minor or herself.

Maria V. minimized mother's cognitive delays, but finally admitted that mother needed help.  Maria V., who worked, said mother and the minor would live with her, and their half sister Dulce would supervise mother and the minor while Maria V. was out.  The social worker advised Maria V. that mother and the minor would both need round-the-clock supervision.

Dulce had recently arrived from Mexico and had just obtained her green card; her criminal or CPS history, if any, was unknown.  Petra, previously mother's guardian, had had physical altercations with her.  Petra would not be willing to take mother into her home.  Neither Dulce nor Petra would be likely to pass an emergency assessment.

Mother's family said the alleged father, Isaac M., "was not in the picture" and had physically abused mother.  He was not present at the minor's birth and did not sign a declaration of paternity.  His whereabouts were unknown.[4]

At the detention hearing on March 22, 2012, the juvenile court ordered the minor placed with "cousins" L.F. and Luis O.

The jurisdiction/disposition report recommended out-of-home placement of the minor with reunification services for mother.

---

[3]  Mother and the sisters share their surname.  For the sake of simplicity, we use only the sisters' first names (and Maria V.'s middle initial, since Maria is also mother's first name).

[4]  Isaac M.'s parental rights were terminated along with those of mother.  He is not a party to this appeal.

Mother denied that she was cognitively impaired and believed she could care for the minor; she admitted, however, that she had never lived alone and could not do so now. She wanted to improve her parenting skills. She was willing to have the minor remain with the maternal second cousin, L.F. Mother received three 3-hour visits per week, supervised by L.F.

The maternal relatives admitted mother had significant cognitive delays and would need 24-hour supervision in caring for the minor. Maternal aunt Petra wanted the minor placed with her, and the other maternal aunts and uncles supported this placement, preferring the minor to be with " 'close' " family rather than " 'extended' " family. But the department rejected this plan because the maternal aunt had five children in her home (including a two year old and a four year old), while the maternal second cousins did not have any younger children at home, and there were no concerns about the minor's current placement.

L.F. and Luis O. were able and willing to continue providing for the minor. Although they wanted mother and the minor to reunify, they would be willing to pursue adoption or guardianship.

At the contested jurisdiction/disposition hearing in May 2012, the juvenile court sustained the section 300 petition as amended, ordered the minor to remain with L.F. and Luis O., granted mother reunification services, and ordered a psychological evaluation of mother.

In August 2012, the department reported that mother had completed infant mental health (IMH) and parenting education courses and had attended group therapy sessions, but her IMH therapist and group therapist were of the opinion that her low cognitive level prevented her from benefiting from their programs. Even after repeated instructions, mother could not fill out basic paperwork.

A psychological evaluation by Jayson Wilkenfield, Ph.D., dated July 29, 2012, stated that mother has been diagnosed since childhood as mildly "mentally retarded."

4

During an interview, her intellectual functioning appeared "considerably below the average range." She had difficulty with dates and chronology and with sustaining attention. She had a "significant deficit" in terms of "practical and social judgment." Her psychological insight was "primitive." She did not grasp many concepts of basic parenting.

Mother's "Full Scale IQ" score was 54, in the bottom 0.1 percent for her age. Personality testing revealed an "at least moderate degree of pathology." Her "Axis II" diagnosis was "Moderate Mental Retardation" with "Paranoid and Schizotypal Personality Traits." (However, her "acute psychological distress" score may have been too high, given that she did not understand many of the test items.)

In Dr. Wilkenfield's opinion, though mother "would likely benefit to at least some degree from additional parenting education," she did not "possess[] the intellectual resources that would be required for her to manage the responsibilities associated with providing for a child's safety and welfare without ongoing supervision." Her pronounced cognitive deficits would cause her to have difficulty with "complex learning" and would "require considerable guidance and supervision to help [her] stay on top of [her] own day-to-day responsibilities." Her deficits as to "judgment, insight and abstract thinking" would prevent her from handling any emergency that required "creative or otherwise complex problem solving." She would not be able to recognize or to deal effectively with unusual circumstances indicating that her child was in distress. Further parenting education could not equip her to "function independently in a parental role."

A prepermanency planning review report filed in October 2012 recommended terminating mother's reunification services and setting a selection and implementation hearing, with the goal of a permanent plan of adoption by the current foster parents.

Mother lived with the minor's maternal aunts Maria V. and Dulce and relied on them for economic support because she had no income. She had completed a series of parenting education classes, but the social worker had not obtained any information about

5

whether she benefited from the classes. She was attending a short-term "Coping with Stress" class, and her case worker at Alta Regional Center was trying to help her to get a job and one-on-one parent training. Her group counseling therapist said mother could not benefit from group counseling because she did not understand the more complex issues discussed and monopolized the group's time. A second psychological evaluation of mother by Larry Nicholas, Ph.D. (attached to the report) reached essentially the same conclusions as Dr. Wilkenfield's evaluation.

Dr. Nicholas's evaluation, dated October 24, 2012, stated that mother's use of language and thought processes were "concrete, suggesting limited intellectual abilities" and were "consistent with some degree of mental retardation." She could not read and comprehend simple sentences in a children's storybook or do basic arithmetic. Her use of vocabulary to communicate was "similar to a six-year-old child." Her past assessment as "mildly mentally retarded" was probably "an underestimate of her limitations at this time."

Mother portrayed herself as "an immature and extremely sheltered woman who has had very limited contact with the world." Her family considered her "fragile, in that her ability to cope with stress and pain is extremely limited." She had held no jobs since high school because she could not complete a job application.

Mother became pregnant as a result of her first and only date with Isaac M. She had had no other sexual experience.

Mother recalled very little about what she had learned during her reunification services. She was not clear about how many classes she had completed.

Mother could not read the items on the O'Leary Parenting Scale; when they were read to her, her answers were inconsistent and showed little understanding of appropriate parenting practices. Her responses on the parenting skills questionnaire showed that she lacked basic knowledge about parenting issues such as nutrition, medical treatment, and coping with children's behavior in common situations.

6

Maternal aunt Maria V. said she wanted mother to regain custody of the minor, but this really meant that she wanted herself and her sisters to have custody because she did not believe mother could independently care for the minor.

In Dr. Nicholas's opinion, mother did not "have the capacity to adequately and independently care for herself, [much] less a child. A child in her care would be significantly at risk for harm. Nor does she have the capacity to substantially benefit from reunification services."

Mother's visitation, originally three times a week for nine hours a week, had been reduced. She claimed there was tension with L.F. and felt that L.F. did not support the visitation. Mother now had twice-weekly, two-hour visits supervised by a family service worker.

During a supervised visit in August 2012, mother could not read directions on a formula can to make a bottle for the minor, even with assistance. However, in October 2012, the family service worker said that mother had slowly progressed in this area, and that after a couple of months of coaching, she could change a soiled diaper alone.

Mother's siblings wanted the minor placed with maternal aunt Petra. Mother, who believed she could parent the minor with her siblings' help, wanted the minor to live with her and maternal aunt Maria V. The department believed, however, that the minor was flourishing in her current placement and no change was warranted.

The department assessed the risk of returning the minor to mother as "very high." Her cognitive deficits would put the minor at risk because mother would be unable to cope with emergencies or situations that required complex problem-solving. She had not benefited from her current services, according to her service providers and the psychologists, and could not do so in the future. She could not provide "reasonable and appropriate parenting and safety" for the minor.

The juvenile court held a contested section 366.21 hearing on November 29, 2012.

7

Social worker Nancy Tinajero, assigned to the case since April 2012, testified that mother's cognitive delays caused concern about placing the minor with her. When she tried to make formula for the minor, it took her two or three months of practice, with instruction by Tinajero and the family service worker, to get the amount and temperature of the water right. Mother's reading and comprehension skills were so limited that she needed help to understand the instructions on the formula can or to fill out paperwork. Mother would not know how to respond in emergencies.

The fact that mother lived with two sisters would "alleviate" Tinajero's concerns, "but not completely[,] because . . . it . . . appears that [mother] needs 24-hour supervision with the child"; that is, "the mother requires supervision as well as the child[,] [s]o it would be two people [who] need to be supervised."[5] It would be "very difficult" for anyone to supervise both mother and the minor. Maria V., one of the sisters with whom mother lived, worked a regular schedule, and recently had also worked nights. When Tinajero met with mother at home, mother was alone.

The minor was thriving with her foster parents. Tinajero had never had any concerns about their care of her.

Family service worker Alida Lopez[6] testified that she had supervised mother's visitation (twice a week for a total of four hours a week) since mid-September 2012, including times when other family members came to the visits. The minor was always happy to see mother; she smiled and reached out for mother, and mother could calm her

---

[5]    Mother asserts: "Even social worker Tinajero acknowledged that if [m]other were constantly supervised by one or more of her sisters the risk to [the minor] would be *significantly* alleviated." (Italics added.) The record citations mother offers to support this assertion do not do so. Tinajero never said she thought the risk would be "significantly" alleviated, and nothing she did say could fairly be so characterized.

[6]    Lopez is not a social worker. To qualify as a family service worker, one need only take certain classes required by the county.

and put her to sleep better than the other relatives.[7]  Mother talked and sang to the minor, played with her, held her, fed her, and changed her.  The minor smiled and baby-talked back to her.  The minor smiled more and was more animated with mother than with other people.  Mother never treated the minor roughly, held her inappropriately, or used excessive force with her.

When the supervised visits began, mother brought a premeasured container of formula, but when Tinajero wanted mother to prepare the formula from the container without premeasuring it, mother could do it.  At first mother "wasn't real comfortable" changing the minor's diapers, and once walked away afterward, leaving the minor unattended; now, however, she did the job well and confidently, and after being told "a couple of times" not to leave the minor unattended, she had not done it again.  She had also improved in feeding the minor; she was very gentle and attentive.

Lopez denied that she had spent "a lot of time coaching" mother.  Lopez did not know who had supervised visits before her or how much time others might have spent teaching mother to do tasks.  When Lopez began to supervise the visits, she was told she had to do so "very closely" because of mother's "delays."  Lopez believed mother could not care for the minor "completely" on her own without guidance in an emergency.

Maternal aunt Maria V. testified that she had lived with mother all their lives; their sister Dulce had lived with them since May or June 2012.  Maria V., an office manager at a nightclub, worked Monday through Friday from 8:00 a.m. to 4:00 p.m.; she had stayed later the last three weeks (once until 9:00 p.m.) due to a "transition of ownership," but was now back to her normal schedule.  If there were an emergency at the job, however, she would probably have to go in.

---

[7]      Lopez had never seen the foster parents care for the minor.

The family's plan was that the minor would live with mother at the home of Maria V. and Dulce; Maria V. would drop off mother and the minor at the home of maternal aunt Petra before going to work; Petra would supervise them during the day; Maria V. would pick them up after work and "help supervise" them; and Dulce, who was off work on Thursdays and Sundays, would also help.[8]  Maria V. "would have them at my side at all times for bottle feeding and diaper change" and "would supervise that everything is done accordingly."  In addition to Maria V., Petra, and Dulce, "[b]asically everybody" in the family was involved and helped when they could.  Petra had the most experience with children, but either she or Maria V. could take care of things well.  Because there were three people in the basic plan, and other family members available to help out, mother and the minor would never be unsupervised; in any event, there was "always the option of child care."

When Maria V. attended visits, the minor was really happy to see mother; there was a bond between mother and the minor that the other family members did not have. Maria V. had seen mother preparing the bottles, changing diapers, changing the minor's other clothing, and putting the minor to sleep.  Maria V. supervised to make sure mother did everything correctly.

Mother had "a mental retardation," but had "overcome . . . a lot of things."  The family had always known of her disability.  They also knew that "she would never be a harm to the child, and especially being supervised."  She was able to cook and clean, and could be "independent at home without being supervised."  She knew what to do in case of emergencies at home.  However, Maria V. did not know whether mother could live on

---

[8]    Maria V. had never been a parent, but she had many nieces and nephews whom she had helped to care for.  Dulce, who was 20 years old, had also helped to raise many nieces and nephews, including infants.  Petra had five children, who were all doing well.

her own.  As of now she could not, because to do so she would have to work to provide for herself and the minor.

Maternal aunt Dulce testified that she had lived with mother and Maria V. for six or seven months.  For the last three months, Dulce had worked five days a week in a store, including Mondays from 9:30 a.m. to 4:30 p.m., Tuesdays and Wednesdays from 12:00 a.m. to 8:00 p.m., Fridays from 11:00 a.m. to 8:00 p.m., and Saturdays from 9:30 a.m. to 8:00 p.m.; she had Thursdays and Sundays off.  She would stay home to supervise mother and the minor on her days off.  Because mother would have supervision from Dulce, Petra (who would have mother and the minor during the day on most weekdays), and Maria V., mother would never be alone with the minor.

Dulce had no children, but she had "always been surrounded by children, by babies"; she had helped to take care of six infant nephews and nieces.  None had ever come to harm in her care.

At visits Dulce attended, the interaction between mother and the minor was "wonderful."  Mother did not appear to have trouble with any parenting tasks.  However, Dulce or another relative would supervise her "[b]ecause . . . right now she doesn't have the capability to completely take care of her baby, and she needs one of us to supervise her."  Dulce could not say that mother could ever "be completely alone with [the minor], but anything can happen."

Maternal aunt Petra testified that she was married with five children (ages 14, 12, 9, 4, and 2) and stayed at home with them.  All but the youngest attended school.  Her four year old attended school for three hours a day; she walked him there.

Petra would take mother and the minor in and supervise them when Maria V. was working.  Mother and the minor could come with her when she took her four year old to school.

Mother would always be supervised "to make sure there was no accident or anything," but Petra thought mother was "learning a lot on how to take care of the baby."

11

Like Maria V. and Dulce, Petra described mother's behavior with the minor on visits in glowing terms and stated that the minor acted differently with mother than with anyone else.

Petra admitted that mother could not take care of the minor without supervision now. She might be able to do so in three years. Even then, however, the family would not leave her alone because they know she "needs some kind of help." If mother failed to progress, Petra would continue supervising her.

After counsel argued the matter, the juvenile court ruled:

1. There was not a substantial probability that the minor, who was under the age of three, could be returned to and safely maintained in mother's home within the next six months. Returning the minor to the mother would create a substantial risk of detriment to the minor's safety, protection, and physical and emotional well-being. The current placement was necessary and appropriate.

2. Clear and convincing evidence showed that although mother had participated regularly in her case plan, she had not made substantive progress. She could not grasp the principles taught in the IMH program, she could not explain to "the psychologist" what she had learned in parenting classes, and she could not benefit from group therapy or grasp the concepts necessary to fully engage in and participate in the group sessions. The psychological evaluations indicated that mother was not capable of caring appropriately for the minor because she had cognitive delays, functioned at the level of a six year old, could not live independently and care for herself and the minor, and could not grasp basic concepts of parenting.

3. The extent of mother's progress toward alleviating or mitigating the causes necessitating placement was poor.

Therefore, the court terminated mother's reunification services and ordered the permanent plan of adoption.

12

DISCUSSION

Mother contends: (1) the juvenile court erred when it failed to recognize that the presumption that return to mother's custody would be detrimental to the minor had been rebutted; (2) the court erred when it found that mother's inability to live and care for the minor independently was a sufficient basis for finding it would be detrimental to return the minor to mother's custody; and (3) the finding that returning the minor to mother's custody would subject the minor to a risk of harm is not supported by substantial evidence.[9] We disagree.

"At the review hearing held six months after the initial dispositional hearing . . . , after considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations . . . , and shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself to services provided . . . . [¶] Regardless of whether the child is returned to a parent . . . , the court shall specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental." (§ 366.21, subd. (e).)

---

[9] We agree with mother that she may challenge the section 366.21 order in this appeal after her challenge to the order by writ petition was summarily denied. (*Joyce G. v. Superior Court, supra,* 38 Cal.App.4th at p. 1514.) We decline respondent's invitation to reconsider our holding on this point in *Joyce G.*

On appeal from a juvenile court finding under section 366.21, we apply the substantial evidence standard; that is, "[w]e review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.]" (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.) We may not reweigh the evidence. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 [appellate court performing substantial evidence review ordinarily looks only at evidence supporting successful party and disregards contrary evidence, resolving all conflicts in favor of respondent].)

I

*The Presumption*

Contrary to mother's assertion, the juvenile court did not "fail[] to recognize that the presumption that return to [m]other's custody would be detrimental to [the minor] had been rebutted."[10] To meet her initial burden of showing detriment, the social worker offered, among other evidence, the findings of the psychological evaluations and the opinions of mother's service providers that although mother had participated regularly in services, she had not benefited from them and her cognitive deficits prevented her from doing so. Mother countered with the opinions of family service worker Lopez and mother's sisters that mother had benefited from her services. The juvenile court expressly relied on the social worker's evidence, citing the psychological evaluations and the service providers' opinions as clear and convincing evidence that mother had not made substantive progress. Thus, we infer the court found mother's rebuttal insufficient.

---

**10**     The presumption mother refers to is that a parent's failure to participate regularly and make substantive progress in court-ordered treatment programs is "prima facie evidence that return would be detrimental." (Cf. *In re Heather B.* (1992) 9 Cal.App.4th 535, 560-561.) Section 366.21, read as a whole, establishes no presumption that return of a minor to a parent's custody would be detrimental to the minor: on the contrary, its underlying presumption is that minors should be returned to parents' custody at the six-month stage, absent a showing of detriment.

On appeal, we "indulge in all legitimate and reasonable inferences to uphold the court's ruling." (*In re Mary B., supra*, 218 Cal.App.4th at p. 1483.) So far as mother asserts the court gave too much weight to the social worker's evidence and too little to her own, she asks us to reweigh the evidence, which we may not do. (*In re I.W., supra*, 180 Cal.App.4th at p. 1527.)

II

*Detriment To Return Minor To Mother's Custody*

Contrary to mother's repeated assertions, the juvenile court did not "err[] when it found that [m]other's inability to live and care for [the minor] independently was a sufficient basis for finding that it would be detrimental to return [the minor] to [m]other's custody." In fact, this claim misrepresents the record. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 414-415.) The court did not find that mother's inability to live and care for the minor independently was "a sufficient basis" for finding detriment. This was only one of the reasons the court gave to support its finding, and the court did not state that any of them alone was sufficient.

It is true, as mother points out, that harm to a minor may not be presumed from a parent's developmental disability, but must be shown by evidence that the disability will endanger the minor's safety. (Cf. *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.) [11] Mother's contrary claim notwithstanding, the department presented such evidence here, and mother's evidence as to her safety plan did not rebut it.

---

[11] Mother also cites authority holding that harm to a minor may not be presumed from a parent's mental illness. Since no evidence of mental illness was presented, this proposition is irrelevant.

15

Relying on the conclusions of the psychological evaluators, the social worker's opinion was that mother's disability would always prevent her from being able to respond effectively in an emergency or in any situation that required complex problem-solving. Even to learn such routine parenting tasks as bottle-feeding and diaper-changing, mother needed a great deal of time and coaching, and it could not be presumed that such extraordinary help would always be available to her in the future. Finally, the opinions of the evaluators and mother's service providers collectively constituted substantial evidence that mother did not have a "grasp of the important parenting concepts" -- a strong basis for finding that returning the minor to mother would create a substantial risk of detriment to the minor's safety, protection, or physical or emotional well-being. (§ 366.21, subd. (e); *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789-790.)

Although mother's sisters claimed they could collectively supervise mother and the minor 24 hours a day and give mother all the training she needed to ensure the minor's safety, the juvenile court could reasonably find their testimony unpersuasive. Two of the sisters worked full-time, and Maria V. admitted that her work hours might expand without notice. (Her offhand admission that the sisters might have to resort to "child care" was not necessarily reassuring.) Petra, with whom mother and the minor would have been left most of the time on weekdays, had a two-year-old child at home full time and a four-year-old child who attended school only a half day; children in that age range normally take substantial time and energy to care for. Maria V. and Dulce did not have children, and their claims that they played a major part in raising their nieces and nephews were not corroborated. Finally, Petra admitted that mother would not be able to care for the minor on her own in less than three years and might need continual supervision even beyond that time. Under all the circumstances, the court could properly find that mother's safety plan was inadequate.

16

Mother asserts that the juvenile court wrongly relied on "out-dated expert opinions" which did not take her safety plan and progress in services into account. This assertion also misrepresents the record. Dr. Nicholas's evaluation was submitted on October 24, 2012, only a month before the six-month review hearing.[12] And Dr. Nicholas did not fail to take mother's purported progress into account. Rather, he concluded, based on mother's hazy recollection of what she had learned in her programs and her equally hazy responses on tests of parenting knowledge, that mother had not made any substantive progress -- an outcome predicted by Dr. Wilkenfield's July 2012 evaluation and consistent with the views of mother's service providers.

III

*Substantial Risk Of Harm To Minor*

Lastly, mother asserts that substantial evidence does not support the juvenile court's finding that returning the minor to mother's custody would subject the minor to a substantial risk of harm. Mother here simply reiterates the points we have already rejected above. We need only note in addition that in this part of her brief, as elsewhere, mother resorts to wholesale string citations to the record to support her factual assertions, which such citations cannot do. (*In re S.C., supra*, 138 Cal.App.4th at pp. 411-412; Cal. Rules of Court, rule 8.204(a)(1)(C).)

Viewing the evidence most favorably to the juvenile court's ruling, substantial evidence clearly supports it.

---

**12**     Mother asserts incorrectly that this evaluation was submitted in September. Its actual date of submission appears at the top of every page.

## DISPOSITION

The order terminating mother's parental rights is affirmed.


       ROBIE       , Acting P. J.


We concur:


     BUTZ     , J.


     HOCH     , J.